Perry J. Narancic, SBN 206820
LexAnalytica, P.C.
160 West Santa Clara Street
Suite 1100
San Jose, CA 95113
Tel: 650-814-7688
Fax: 650-618-2700

Attorneys for Plaintiff
WEBCASTER ALLIANCE, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Webcaster Alliance, Inc.<br><br>　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>Recording Industry Association of America, Inc., Universal Music Group, Inc., Warner Music Group, Inc., Bertelsmann Music Group, Inc., Sony Music Entertainment, Inc., Capitol-EMI Music, Inc.<br><br>　　　　　　　　　Defendants. | Case No.: CV 03-03948 WHA<br><br>**COMPLAINT**<br><br>**(1)  Unlawful restraint of trade in the market for domestically copyrighted sound recordings (Sherman Act § 1)**<br><br>**(2)  Illegal maintenance of monopoly in the market for domestically copyrighted sound recordings (Sherman Act § 2)**<br><br>**Demand for Jury Trial** |

Plaintiff alleges as follows:

### I.　　NATURE OF PROCEEDINGS

1.　　This is an action brought under the antitrust laws of the United States to restrain anticompetitive conduct by the Defendants which threatens to injure Plaintiff and its members as a result of Defendants' exclusionary conduct in the markets for domestically copyrighted sound recordings and Internet distribution of such sound recordings.

2.　　Plaintiff is a trade association whose members are engaged in the business of Internet radio, also known as webcasting. Webcasting is the Internet equivalent of terrestrial radio

whereby digital data is transmitted in real-time, without downloading any physical files. But unlike the broadcasting of signals in traditional radio, Internet radio involves the transmission of streams of data to an individual listener.

3. Internet radio is a vital form of media that allows ordinary individuals to transmit ideas, music, opinions and other content to an international audience. Like traditional terrestrial radio, Internet radio is an important medium that allows for the free expression of ideas, news and opinion. However, the commercial success of Internet radio as a viable line of commerce is dependent on securing access to suitable content, which is subject to the intellectual property rights of its owners.

4. To allow for the growth of this medium, Congress enacted the Digital Millennium Copyright Act of 1998 ("DMCA") to provide certain non-subscription Internet radio stations with a compulsory license to perform copyrighted sound recordings. Under the DMCA, the royalty rates for such compulsory licenses can be established by either a voluntary agreement, or failing such voluntary agreement, the Copyright Office may initiate a Copyright Arbitration Royalty Panel ("CARP") in order to establish such rates.

5. A CARP proceeding commenced in April 2001 to establish royalty rates for Internet radio for the period October 28, 1998 – December 31, 2002 (the "CARP")

6. The Recording Industry Association of America, Inc ("RIAA"), a trade association controlled by the five major labels who account for over 80% of all domestically copyrighted content produced and distributed in the United States (the "Major Labels"), acted as a negotiating agent on behalf of its members in the CARP proceedings.

7. The CARP submitted its report to the Librarian of Congress on February 20, 2002, which report included certain recommendations as the appropriate webcasting royalty rates. (the "CARP Rates").

8. However the Librarian of Congress rejected, in part, the CARP report, and the Librarian of Congress set the rates in a final order that was announced on June 20, 2002, and which was published on July 8, 2002 (the "LOC Rates")

LexAnalytica,PC

9. The LOC Rates were primarily based on the royalty rates that were agreed to in a licensing agreement between Yahoo, Inc., the second largest commercial webcaster in the world, and RIAA (the "Yahoo Agreement"). In his July 2002 final rule, the Librarian of Congress found, among other things, that the fair market rate for licensing sound recordings was $0.0007 per performance.

10. However, the LOC Rates generated a large outpouring of concern by Internet radio stations in the United States, especially small commercial Internet radio stations that did not participate in the CARP because of the prohibitively high cost of participating in the proceedings. Plaintiff was formed in October 2002 for the reason of objecting to the LOC Rates, and organizing the voice of those small Internet radio stations that were excluded from the CARP proceedings.

11. Many webcasters condemned the LOC Rates as unreasonably high, and further complained that they did not represent the fair market value for the license rights in question. In particular, many small commercial Internet radio stations complained that the Yahoo rates (which were the principal basis of the LOC Rates) were artificially high.

12. Based on the LOC Rates, small webcasters faced immediate extinction because the back-royalties from the period commencing October 1998 were catastrophically high.

13. Congress enacted the Small Webcaster Settlement Act of 2002 ("SWSA") with the purpose of providing relief to small webcasters from the LOC Rates. SWSA amended certain provisions of the DMCA relating to the compulsory licenses for small webcasters. Among other things, SWSA recognized SoundExchange, an unincorporated division of RIAA which is wholly controlled by RIAA, to enter into agreements on behalf of all copyright owners and performers to set rates, terms and conditions for small webcasters operating under DMCA statutory licenses.

14. Pursuant to SWSA, SoundExchange entered into a licensing agreement with a private trade association called Voice of Webcasters ("VOW"), which agreement was published in the Federal Register on December 24, 2002 (the "VOW Agreement").

15. Pursuant to section 4 of SWSA, the licensing option set forth in the VOW

Agreement was made available to any eligible small commercial webcaster. Thus, a private negotiation between RIAA and VOW became, by virtue of SWSA, an industry-wide deal for all small webcasters.

16. The rates and terms set forth in the VOW Agreement included, among other things, a royalty rate based on a percentage of revenue, as well as onerous record-keeping requirements. However, the rates in the VOW Agreement were not only unreasonably high, but actually put many small webcasters in worse position than under the LOC Rates by among other things, increasing by four-fold the minimum fee found to be reasonable by the CARP.

17. For the reasons set forth in this Complaint, Plaintiff alleges that VOW and the Major Labels (through RIAA) entered into unlawful agreements (i.e. Yahoo Agreement and the VOW Agreement) which had the intent and effect of restraining competition in the market for domestically recorded sound recordings and in the market for Internet distribution for such sound recordings

18. Faced with exclusionary licensing rates under both the LOC Rates and VOW Agreement, Plaintiff's members are faced with certain and imminent extinction. None of Plaintiff's members are in compliance with either licensing regime because the available rates and terms are exclusionary. To its knowledge, all of Plaintiff's members do pay copyright royalties in respect of musical works to BMI, ASCAP and SESAC, and wish to enter into fair and reasonable licensing arrangements with the copyright owners.

## II. JURISDICTION, VENUE AND COMMERCE

19. This Court has jurisdiction over this matter pursuant to Section 4 of the Sherman Act, 15 U.S. C. § 4 and 28 U.S.C. §§ 1331, 1337.

20. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391, because all the Defendants transact business and are found in this District.

21. The Major Labels distribute sound recordings throughout the United States, and across state and international borders. The activities of the Major Labels substantially affect

interstate and foreign commerce.

## III.  THE PARTIES

22. Plaintiff Webcaster Alliance, Inc. is a non-profit corporation organized under the laws of the state of Nevada.

23. Defendant RIAA is a corporation organized under the laws of the state of New York.

24. Defendant Universal Music Group, Inc. is a corporation organized under the laws of the state of California.

25. Defendant Warner Music Group, Inc. is a corporation organized under the laws of the state of Delaware.

26. Defendant Bertelsmann Music Group, Inc. is a corporation organized under the laws of the state of Delaware.

27. Defendant Sony Music Entertainment, Inc. is a corporation organized under the laws of the state of Delaware.

28. Defendant Capitol-EMI Music, Inc. is a corporation organized under the laws of the state of Delaware.

## IV.  THE RELEVANT MARKETS

29. There are two relevant product markets: the market for domestically copyrighted sound recordings in the United States (the "Sound Recordings Market"), and the United States market for commercial webcasting distribution of domestically copyrighted sound recordings (the "Webcasting Market").

A.  **THE SOUND RECORDINGS MARKET**

30. Music in the United States is created in an economic system that, for the most part, bifurcates creativity, on the one hand, and commercialization of such creativity on the other.  This bifurcation is reflected in Section 102 of the Copyright Act, which includes "musical works" and "sound recordings" as separate categories of eligible copyright protection.  "Musical works" refers to the notes and lyrics of a song, while "sound recordings" result from the fixation of

LexAnalytica,PC

musical, spoken or other sounds in a tangible medium.

31.  Musical artists typically own the copyright underlying the musical works they create. These artists typically have contractual arrangements with one or more performing rights organization ("PRO"), such as Broadcaster Music, Inc, ("BMI"), American Society of Composers and Publishers ("ASCAP") and SESAC, Inc. These PROs, in turn, offer blanket licenses to users, such as radio stations.

32.  A given musical work can be the subject of numerous sound recordings by different artists. The copyright in each sound recording is typically owned by a record label, which typically produces, markets and distributes the recording. Under the Copyright Act, agents designated to distribute royalties distribute the collected royalties to both sound recording and musical work copyright owners.

33.  Sound recordings which are either created or distributed in the United States accounts for approximately $14 billion in annual revenues.

34.  The Sound Recordings Market is comprised of a number of musical genres, such as Country, Classical, Rock, Pop, Hip-Hop and Alternative. Record labels engage in the business of producing, marketing and distributing these sound recordings.

35.  RIAA's members create or distribute 90% of all non-pirated sound recordings which are produced and sold in the United States. The Major Lables tend to focus on hits in broad-based genres such as Country or Pop ("Mainstream Content").

36.  In addition to Mainstream Content, independent artists create music that competes with Mainstream Content. Independent artists are those who either (a) are not signed with a label and self-produce and distribute their music, or (b) are signed with a small record label.

37.  The content created by independent artists and independent labels ("Independent Content") has a financial model which differs from that of Mainstream Content. Whereas Mainstream Content typically involves large production, marketing and distribution investments, return on investment can only be realized with large sales volumes. By contrast, Independent Content typically involves a lower cost structure that enables a lower volume of sales. In other

words, the break-even point for Mainstream Content is typically much higher than for Independent Content. As a result, the lower cost to produce and distribute Independent Content allows artists not signed to an RIAA label to produce and distribute a more diverse variety of content that increases consumer choice.

38. Although Independent Content has traditionally had lower cost structures, it competes with Mainstream Content for listenership and consumer dollars. Today, approximately 10% of the Sound Recordings Market is comprised of Independent Content, and this figure is growing at the expense of Mainstream Content.

B. THE WEBCASTING MARKET

39. Until the advent of the Internet, the Major Labels had a near-exclusive hold on distribution and marketing channels to consumers, such as radio station play, shelf space in major retail outlets, tour bookings, promotions and music videos.

40. The Internet allows the owners of Mainstream Content and Independent Content alike to reach consumers directly in a highly targeted manner. However the relative advantage of the Internet is greater for owners of Independent Content, because Independent Artists can now disintermediate the Major Labels and circumvent the essential marketing and distribution channels previously controlled by the Majors Labels. As a result, the Internet has made Independent Content commercially viable on a large scale.

41. The Internet radio Market today is comprised of approximately 5,000 commercial enterprises, most of which are small stations that include a mixed format of Mainstream and Independent Material. These webcasting businesses are an essential distribution channel for Independent Content.

V.    ANTICOMPETITIVE CONDUCT

A. THE DEFENDANTS' CONSPIRED TO ESTABLISH AN EXCLUSIONARY ROYALTY RATE IN THE YAHOO AGREEMENT.

42. The CARP primarily based its recommendations for webcasting rates and terms on

those set forth in the Yahoo Agreement. However, it made a finding of fact that RIAA had artificially inflated many of rates in the Internet radio license agreements it entered into before the April 2001, including the Yahoo Agreement, in order to establish a "benchmark" for an eventual CARP proceeding. In so finding, the Panel found that RIAA only entered into negotiations with those entities that were willing to pay high rates (even with unstable companies) and that in so doing "RIAA created a virtually uniform precedent with rates above those that most buyers would be willing to pay".

43. For the reasons set forth in the foregoing paragraph, the CARP did not consider the rates in all but one of the early agreements as establishing a fair market rate. Instead, the CARP relied on the Yahoo Agreement as the basis for setting royalty rates, based on the rationale that Yahoo was a business with "resources, sophistication and market power comparable to that of the RIAA" and that the resulting agreement reflected a "truly-arms-length bargaining process on a level playing field between two major players of comparable skill, size and economic power".

44. However, following release of the CARP report in February 2002, a high-ranking official of Yahoo testified before the United States Congress that rates in the Yahoo Agreement were "excessive":

> The fees ultimately set by the CARP in its recent report were considerably higher than any fair market outcome or any reasonable construction of the economics of the Yahoo-RIAA Agreement. The Panel did not appropriately address the unique facts and circumstances surrounding the Yahoo/RIAA Agreement, yet the Panel explicitly used certain terms of that Agreement as a benchmark for industry rate-setting. The result is that a single specific agreement based upon the unique situation of an individual company whose business model was atypical of Internet Internet radio stations in general, has been misapplied to set excessive rates for an entire industry.
> http://www.house.gov/judiciary/mandelbrot061302.htm

45. RIAA and the Major Labels either knew or should have known that the Yahoo Agreement would establish a "benchmark" for the CARP.

46. It was not only the magnitude of the rates, but also the royalty formula in the Yahoo Agreement that served to exclude small internet radio stations. The Yahoo Agreement was based on a per performance fee, which is a formula that operates to the distinct disadvantage of small

LexAnalytica,PC

internet radio stations.

47. Despite the excessive benchmark, RIAA vigorously advocated for the adoption of the rates of the Yahoo Agreement before the CARP Rate and LOC Rate proceedings.

48. Yahoo declined to participate in the CARP, and Plaintiff does not know if Yahoo made its own view of the "excessive" rates known to any interested party during the CARP proceeding.

B. **THE DEFENDANTS CONSPIRED TO ESTABLISH AN EXCLUSIONARY ROYALTY RATE UNDER THE VOW AGREEMENT.**

49. Following the publication of the LOC Rates in July 2002, many small webcasters raised objections to the confiscatory rates set forth therein. Beginning in July 2002, one group of small webcasters who belonged to a trade association known as Voice of Webcasters attempted to negotiate a separate, private license agreement with RIAA.

50. VOW asked the law firm of Shaw Pittman LLP to represent the group as legal counsel. Despite potential conflicts between the individual members of VOW, Shaw Pitman agreed to undertake the representation and sought a $1000 retainer from each member of VOW.

51. VOW representatives attended a meeting with the RIAA at RIAA offices in Washington, D.C. in July 2002. At that meeting, the VOW representatives were authorized by the VOW members to commence negotiations at 3% of webcasting revenues, and to settle on a rate up to 5-6% of webcasting revenues. These figures were based on the total royalty rates payable to the three PROs in respect of licenses for musical works.

52. VOW's July 2002 meeting with RIAA ended with RIAA holding firm on a royalty rate of 10%-12%. Throughout the summer of 2002, RIAA repeatedly added additional onerous terms that were not part of the initial July 2002 negotiations. Finally, in view of what appeared to be bad-faith negotiation by the RIAA, certain VOW members decided to leave the negotiation process, and did so.

53. But one group of VOW members persisted in negotiating a licensing deal, that ultimately was more favorable to RIAA than RIAA's original proposal in July 2002. This group

LexAnalytica,PC

consisted of Radioio, Digitally Imported, 3Wk, Classical Music Detroit and Ultimate 80's (the "VOW Supporters").

54. Four our of the 5 VOW Supporters entered into an agreement with RIAA and the Major Labels, which ultimately became SWSA and the VOW Agreement. The VOW Supporters were motivated to enter into this agreement by a desire to reduce back royalty liabilities for the period 1998-2002 that would otherwise be due under the CARP Rates, which were due in full on October 20, 2002.

55. In the case of Radioio, its back royalties under CARP rates were approximately $100,000 for each year of webcasting, which were reduced to approximately $13,000 per year.

56. RIAA and the Labels were acutely aware that certain VOW members faced significant back royalties under the LOC Rates and that these members would be effectively out of business if such royalties became due on October 20, 2002. Using such negotiating leverage to its maximum effect, RIAA and the Labels coerced certain VOW members to support a small webcasting agreement that would be applied to all small webcasters under SWSA.

57. Although the savings in back royalties under VOW Agreement were substantial for the VOW Supporters, these savings achieved by mortgaging the future for all small webcasters. Since the publication of the VOW Agreement, RIAA has refused to negotiate with Plaintiff or any of its members.

58. In so becoming parties to the VOW Agreement, the VOW Supporters became willing co-conspirators with RIAA and the Labels in establishing an anticompetitive agreement whose purpose and effect was to unlawfully exclude competition in the Webcasting Market.

59. One consequences of the VOW Agreement has been to erect a significant barrier to entry in the Webcasting Market, that are not based on legitimate justifications. One such barrier,m for instance, is the four-fold increase in minimum fees in the VOW Agreement, over the minimum fees set forth in the CARP and LOC Rates.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Conspiracy to Restrain Trade in the Market for Sound Recordings
In Violation of Section 1 of the Sherman Act**

60. Plaintiff incorporates the allegations of paragraphs 1 through 59 above.

61. The Defendants' conduct in securing webcasting license rates (in the CARP Proceedings and the SWSA negotiations) based on artificially inflated rates in the Yahoo Agreement had the purpose and effect of eliminating small webcasters, which in turn, eliminates the principal distribution channel for Independent Content.

62. As a result of the decline in the total number of webcasters, and royalty rate arrangements which are designed to keep small webcasters insubstantially small, the Defendants have caused injury to Plaintiff's members which is integral to the antitrust injury in the Sound Recordings Market.

63. As a result of Defendant's unlawful conduct, Plaintiff's members are in a position of threatened loss or damages because they are not in compliance with any webcasting licensing regime, and are exposed to legal action by RIAA and the Major Labels for copyright infringement.

### THIRD CLAIM FOR RELIEF

**Illegal Maintenance of Monopoly in the Market for Sound Recordings
in Violation of Section 2 of the Sherman Act**

64. Plaintiff incorporates the allegations of paragraphs 1 – 63 above.

65. As a result of the Defendant's conduct in choking off the only viable distribution channel of Independent Music, Defendants have unlawfully maintained a shared monopoly in the Sound Recordings Market.

## VII.   PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF PARYS FOR RELIEF AS FOLLOWS:

1. That the Court adjudge and decree as follows:

LexAnalytica,PC

      a.      That Defendant's conduct in negotiating the Yahoo Agreement violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2;

      b.      That the Defendant's conduct during the CARP proceedings relating to the setting of royalty rates, and their representations about the Yahoo Agreement in particular, violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2;

      c.      That the Defendant's conduct in negotiating the VOW Agreement violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

2. That the Major Labels, and all persons acting on their behalf or under their direction or control, and all successors thereto, be preliminarily and permanently enjoined from enforcing their otherwise legitimate intellectual property rights in sound recordings against any small webcaster until the violations alleged in this Complaint are remedied.

3. That the Court enter such other preliminary and permanent relief as is necessary and appropriate to restore competitive conditions in the markets affected by Defendants' unlawful conduct.

4. That the Court enter such additional relief as it may find just and proper.

5. That the Plaintiff recover its costs of this suit, including its attorney's fees, as provided by law.

**JURY DEMAND**

Plaintiff demands trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

DATED: November 28, 2003       For the Plaintiff WEBCASTER ALLIANCE, INC.

Perry J. Narancic
LEXANALYTICA, P.C.
160 W. Santa Clara Street
Suite 1100
San Jose, CA  95113
Tel:  (408) 286-2506
Fax:  (650) 618-2700

LexAnalytica,PC